A powerful steamer, at full speed, on a dark night, although in mid-ocean, has no right to omit any duty which belongs to such a situation. She must almost necessarily destroy any small vessel with which she comes in collision. Her duty is to keep out of the way of any sailing vessel she may meet. It is of the utmost importance, therefore, that she keep a constant and vigilant watch for their appearance. Having the greater power to destroy, she should be the more watchful to preserve. The highest skill is required from her, both in respect to her officers and responsible men. The greater the responsibility, the greater the diligence required.

It cannot, for a moment, be doubted, that two faithful and competent men upon the forecastle of the Java, with their view unobstructed by sails, would be more likely to discover approaching lights and vessels, than if stationed at the ends of the bridge, with the lower sails set upon the foremast. The general orders of the master were, that there should be two lookouts on the forecastle, on any night when they could be there with safety to themselves, and one during the day. They are not to be stationed there when it would unnecessarily endanger their lives; but, clearly, under ordinary circumstances, that is the best place for observation, and, if they are withdrawn to another position, care must be taken that the loss of advantage which arises from the change is made up, as far as possible, in some other way. The best watch that can be secured must in some form be maintained.

On this occasion, the lookouts were withdrawn to the bridge. At the speed the steamer was going, they could not reasonably have been required to remain upon the forecastle forward of the mast. Upon the bridge, with the fore-trysail set, it must have been obvious to all that their view was obstructed. If it was necessary to keep the sail up, to steady the ship, something should have been done to compensate for the loss its maintenance in that position entailed. Sometimes, when a man cannot be stationed upon the forecastle forward of the mast, he may, with propriety, be kept at the mast. It matters not that this may require the employment of additional force upon that duty. If needed, it should be supplied. But, if that cannot be done, or something else reasonably sufficient for the accomplishment of the object in view, the speed must be slackened. In all cases, speed must yield to safety, when required.

In this case, nothing was done upon the Java to make up for the loss in the position of the lookout. The sail was not taken in, no attempt was made to keep a lookout at the foremast, and the speed was not slackened. On the contrary, the vessel was driven at her utmost speed, under the circumstances. The lookouts either did not or could not perform their duty, and the loss occurred. In my opinion, the steamer was solely in fault, and should make good the damages.

The testimony taken since the hearing in the district court does not materially affect the case. I do not place the most implicit confidence in all that is said by some of the witnesses, but, were it all true, the result would not be changed. It is of no consequence that the bark did set out upon her voyage with a short supply of oil, if, as I think is fully established, she was sailing with the proper lights on the night when the collision occurred. With proper and vigilant lookouts, stationed where they ought to have been, upon the steamer, and performing their duty, it is probable the accident would not have happened.

A decree should be rendered in favor of the libelants, for the agreed damages, $15,894 55. and interest from December 31st, 1874, with costs.

## Case No. 7,234.

### The JAVA.

[1 Lowell, 165.] [1]

District Court, D. Massachusetts. Oct., 1867.[2]

R. H. Dana, Jr., for libellants.
W. G. Russell, for claimants.

LOWELL, District Judge. The libellants were the owners of a valuable cargo of linseed which was shipped on board the schooner James McCloskey, bound from Boston to New York. The schooner was towed from one of the wharves in East Boston into the stream, and was getting under way near the schoolship George M. Barnard, and had only a part of her foresail hoisted, when her master saw the large Cunard propeller steamer Java coming round the stern of the schoolship and

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[2] [Reversed in Case No. 7,559. Decree of circuit court reversed in 14 Wall. (81 U. S.) 189.]

making directly for the schooner. The schooner's helm was put hard astarboard, but the steamer struck her abaft the main rigging and knocked a hole through her, and the linseed was damaged to the amount of some seven thousand dollars.

There is no doubt or question concerning most of the facts of the case. The weather was clear and fine, with a good breeze, the precise direction of which is not important; the time about one o'clock in the afternoon, the tide an early ebb, and neither vessel was seen from the other until just before the collision. The questions which arise are, whether, under the circumstances, either or both vessels were guilty of any negligence which caused or aided in causing the collision.

The burden of proof is on the steamer. And the first question is, whether her lookout was sufficient. It is shown that she had three persons properly stationed forward on the lookout, and the evidence is, on the whole, clear and decisive that they were vigilant and discovered the schooner, not only as soon as she discovered the steamer, but as soon as with reasonable diligence they could have discovered her. It appears, too, that the steamer was proceeding very slowly, having stopped her engines some little time before to make sure of clearing another vessel, and that upon the schooner being seen, prompt and efficient measures were taken to clear her, but that it was too late.

The allegation to which most of the evidence and arguments have been addressed is, that the Java was in the wrong in attempting to pass on the inner or East Boston side of the schoolship when and as she did. It appears that the George M. Barnard is a large vessel, high out of water, which is kept constantly moored during the winter months near the edge of the channel, leaving as much room as possible on the outside between her and Boston, and only a narrow passage on the other side, so that a vessel of the size of the Java could not pass there excepting at or near high-water. There was evidence tending to show that the Cunard steamers rarely do take this passage, though other vessels nearly as large do so not unfrequently, and that it would not be considered prudent for so large a vessel to attempt it when it was much obstructed. The fact that vessels of large size do or do not frequent the place is of little importance compared with more direct and pertinent evidence concerning the safety of the passage itself. That Cunard steamers rarely go there might be material in ascertaining whether the schooner in getting under way in that part of the channel had any reason to expect to meet the steamer there, and so bear upon the diligence or want of it on the schooner's part, and upon that ground I admitted this testimony; but it has not become material to the decision of the cause. Upon the whole evidence I am satisfied that a prudent and skilful navigator would not hesitate to take the Java through that passage at that state of the tide, if he saw no obstructions, as of vessels at anchor, or the like.

It is said that if the steamer had taken a course more nearly parallel with that in which the schoolship was lying, she would have seen the schooner earlier, and might have avoided her; and this is true. But whatever direction she had taken the schoolship would have shut out some points of the compass, and there was no reason to apprehend danger from one point more than from another. The case is simply one of running under the stern of a vessel at anchor at a somewhat acute angle, and I am not prepared to say that this is bad navigation, if it be done as slowly and with as much vigilance as is shown in this case. A man may drive round the corner of a road if that is the most convenient way home, though he ought to do it slowly and with more than ordinary care if he cannot see what is on the other side. The failure to see the schooner probably arose from the fact that her sails were not set. I am not prepared to say that this was a fault on her part; but it was her misfortune.

A consideration of a good deal of weight with my mind in one aspect of the case is this: That the collision does not appear to have been affected in any degree by the narrowness of the channel. The steamer was simply coming out from behind the schoolship in one direction and the schooner in another, and however wide the channel might have been, the former could have done no more than she did. She took the proper measures promptly and without the slightest embarrassment from the narrowness of the passage between the ship and the flats, which in fact she had scarcely reached. So that I cannot see that the propriety of the steamer's course, considered with reference to the peculiarities of this passage, has much importance in the case. Nor is the fact that she intended to go to the Cunard dock very important, because she was not heading for the dock when the collision happened. It seems that the accident might and would have happened just as it did if the steamer had been going to any other dock, and the schoolship had been anchored in mid-channel, provided the relative position of the three vessels had been the same. So that it comes back, as I have said, merely to the question of running under the stern of a vessel at anchor at an acute angle. And I cannot say that any negligence has been shown on the part of the officers of the steamer, but must hold that this accident, though occurring in broad day, was what the law terms an inevitable misfortune. The distinction between this case and Crockett v. Newton, 18

How. [59 U. S.] 581, is precisely in the sails of the schooner not being visible over the schoolship. Decree for the claimants.

### Case No. 7,235.

JAY v. ALLEN et al.

[1 Spr. 130.][1]

District Court, D. Massachusetts. March 13, 1846.[2]

F. C. Crowningshield, for libellant.
T. G. Coffin, for respondents.

SPRAGUE, District Judge. The first question is, whether this is a stale claim. The last communication proved to have taken place between the owners and the libellant, in relation thereto, was in October, 1839. This libel was filed within six years therefrom, viz., in May, 1845. The last letter from the respondents' attorney requests the libellant to wait for the adjustment of his share, until the insurance had been settled. At what time the insurance was settled, or abandoned, does not appear.

It is generally true, that "courts of admiralty, like courts of equity, govern themselves in the maintenance of suits, by the analogy of common law limitations." The acknowledgment made by the correspondence would be sufficient to take the case out of the statute at common law. Brown v. Jones [Case No. 2,017]; Willard v. Dorr [Id. 17,679]; The Rebecca, 5 C. Rob. Adm. 102; The Sarah Ann [Case No. 12,342].

It is further urged, that the delay of the libellant in enforcing his claim, may have deprived the respondents of the means of proving that he was incompetent, or had deserted; it is not, however, even alleged that he was incompetent, and it is not proved that he deserted; and no such presumption of desertion can arise, any more than of payment.

It is not, therefore, to be deemed a stale claim. In regard to the other defence set up by the respondents, it appears that 1250 barrels of oil had been taken before the libellant was discharged, and the ship was afterwards condemned at Tahiti, as unseaworthy. A small part of the oil was sent home by another vessel, the residue sold by the captain, and the proceeds fraudulently appropriated to his own use.

The question is, whether the owners are responsible to the libellant, for his share of the oil sold by the captain. By the shipping articles, the contract is made between the libellant, as one party, and the master and owners. The seaman never had any ownership of the oil. The amount of his compensation was to depend upon the quantity taken; and payment was to be made as soon after the arrival of the vessel at her home-port, as the oil could be sold, and an adjustment made.

The respondents were bound to furnish a seaworthy ship to take and bring home the oil, and they were in default in not doing so. Upon the condemnation of the vessel, the custody and care of the oil devolved upon the master, who must be deemed the agent

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]
[2] [Affirmed in Case No. 7,552.]